**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JEREMY REYNOLDS,**

                      **Plaintiff,**

         **v.**

**VILLAGE OF CHITTENANGO et al.,**

                    **Defendants.**

**5:19-cv-416**
**(GLS/ML)**

_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFFS:**
Bosman Law Firm, LLC         AJ BOSMAN, ESQ.
3000 McConnellsville Road
Blossvale, NY 13308

**FOR THE DEFENDANTS:**
Weaver Mancuso Brightman PLLC    SHANNON T. O'CONNOR. ESQ.
16 Oswego Street - Suite 2
Baldwinsville, NY 13027

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Jeremy Reynolds brought this action alleging various claims pursuant to 42 U.S.C. § 1983 and New York State law against defendants Village of Chittenango; Wayne Horning, Mayor and Trustee; Colleen

Baldwin, Trustee; Elizabeth Bough-Martin, Deputy Mayor and Trustee; Mickey Kopp, Mayor and Trustee; Michael Keville, Mayor; Fred Corey, Jr., Chief of the Village of Chittenango Police Department; George Millet, Corporal; Cassandra Cimpi; and John Does.  (Compl., Dkt. No. 2.) Reynolds' claims against Baldwin, Bough-Martin, Millet, Keville, and the Doe defendants were previously dismissed, leaving Kopp, Horning, Corey, Cimpi, and the Village as the only remaining defendants.  (Dkt. No. 13.) Now pending is defendants' motion for summary judgment on all of Reynolds' remaining claims.  (Dkt. No. 115.)  For the reasons that follow, defendants' motion for summary judgment is granted in part and denied in part.

## II. **Background**

### A.   **Facts**[1]

After completing the police academy and subsequent field training, Reynolds worked full time as a police officer for the Manlius Police Department from 2007 until 2017.  (Defs.' Statement of Material Facts (Defs.' SMF), ¶ 8, Dkt. No. 115, Attach. 4.)  Reynolds' first day at the

---

[1]  Unless otherwise noted, the facts are not in dispute.

Manlius Police Department was September 2, 2007, and his probation period—a time during which an employee has not yet been granted a permanent appointment and may be terminated at-will—ran for eighteen months from that date.  (*Id.* ¶¶ 10-11; Dkt. No. 115, Attach. 2, Ex. 1 at 18, Madison County Civil Rule XIV.1.)  During his employment at the Manlius Police Department, Reynolds was the subject of three disciplinary actions: (1) the first "involved his tapping the car he was pursuing in a chase, for which he lost vacation days"; (2) the second "involved sending an inappropriate response email to all to an email from the captain about tampering with computers, for which he believes he received a written reprimand"; and (3) the third "involved a search with an unauthorized consent from a realtor, for which he received a letter of training."  (*Id.* ¶ 14.) On February 26, 2017, Reynolds left the Manlius Police Department due to a "conflict" with the acting chief.  (*Id.* ¶ 12.)  After his resignation from the Manlius Police Department, Reynolds worked part-time with the Canastota Police Department from April 2017 to September 2020.  (*Id.* ¶ 18.)

In November 2013, during the time he was employed full-time by the Manlius Police Department, Reynolds began working part-time for the Chittenango Police Department.  (*Id.* ¶¶ 20-23.)  During this time, Reynolds

worked forty hours per week in Manlius and between eight and twenty hours per week in Chittenango.  (*Id.* at ¶ 24.)  After resigning from the Manlius Police Department in February 2017, Reynolds continued to work part-time for the Chittenango Police Department until beginning a full-time position on July 24, 2017.  (Defs.' SMF ¶¶ 26, 28.)  Reynolds knew that he would have to complete a probationary period as a condition of his new full-time employment with Chittenango.  (*Id.* ¶ 34.)

On August 1, 2017, Jill Doss, the Chittenango Village Clerk-Treasurer at the time, submitted a Report of Personnel Change for Reynolds to the Madison County Department of Personnel/Civil Service Officer Eileen Zehr.  (*Id.* ¶ 223.)  The Report of Personnel Change indicated that Reynolds was a "lateral transfer" to the Chittenango Police Department on July 24, 2017.  (*Id.* ¶ 224.)  Defendants assert that Doss' submission on August 1, 2017 was incorrect in categorizing the nature of Reynolds' personnel change as a lateral transfer and, as such, the Report of Personnel Change was rejected by the Madison County Department of Personnel/Civil Service—Reynolds denies this assertion, and emphasizes that he was originally designated as a lateral transfer on the form.  (*Id.* ¶ 225;  Pl.'s SMF ¶ 225, Dkt. No. 118, Attach 28.)  According to

defendants, the Report of Personnel Change was "amended to indicate the correct nature of the personnel change . . . by striking out the word lateral . . . and checking the 'Reinstatement' option on the same form." (Defs.' SMF ¶¶ 226, 238.)  Reynolds disagrees, instead claiming that he was not advised of the need to correct the form, it was altered without notice to him, he was never afforded an opportunity to challenge a change to his designation, and that the characterization of his personnel change as a reinstatement is incorrect.  (Pl.'s SMF ¶¶ 225-26, 238.)  Ultimately, defendants contend that Reynolds was a "resignation reinstatement," while Reynolds maintains that he was a "lateral transfer."  (Defs.' ¶¶ 144, 195; Pl.'s SMF ¶¶ 144, 195.)  Reynolds admits, however, that he does not possess personal knowledge as to whether he was considered a lateral transfer or a resignation reinstatement when he began full-time with the Chittenango Police Department.  (Defs.' SMF ¶ 38.)

According to Chittenango Police Department General Order No. 201, if an employee is a lateral transfer, his or her probationary period is six months, while, according to the Madison County Civil Rules, an employee hired as a resignation reinstatement, is subject to a maximum probationary period of eighteen months.  (Dkt. No. 115, Attach. 50; Dkt. No. 115, Attach.

2, Ex. 1 at 21, Madison County Civil Rule XIV.9, 10; Defs.' SMF ¶¶ 194-95;

Pl.'s SMF ¶¶ 194-95.)  If an employee is released from probation before

the maximum length of their probationary period, they will be informed via a

written notice/letter.  (Defs.' SMF ¶ 194; Pl.'s SMF ¶ 194; Dkt No. 115,

Attach. 2, Ex. 1 at 18, Madison County Civil Rule XIV(e).)  In addition to his

contention that he was a lateral transfer, subject to a six-month

probationary period, Reynolds claims that Corey told him that his probation

would be only ninety days.  (Pl.'s SMF ¶ 141.)  There is no evidence in the

record which indicates that Reynolds received a written notice that his

probationary term had been successfully completed and would be ending

before the maximum period.

As for Reynolds' actual work as a police officer, his primary vehicle

while on duty was Vehicle 30, which was used by the Chittenango Police

Department for patrol.  (*Id.* ¶¶ 43-44.)  On multiple occasions after he

began full-time in July 2017, Reynolds complained to his superiors, Chief

of Police Corey and Sergeant Capria, about an exhaust leak in Vehicle 30,

which he claimed caused him to suffer headaches and nausea.  (*Id.* ¶¶ 47-

50.)  Reynolds performed a test to determine whether an exhaust leak was

occurring in Vehicle 30—he contends that the test was for "CO" (carbon-

monoxide) while defendants contend that the test was for "CO2" (carbon dioxide).[2]  (*Id.* ¶¶ 51-53.)  In response to Reynolds' complaints, Corey had Vehicle 30 inspected at an auto repair and body shop in Chittenango.  (*Id.* ¶ 54.)  Vehicle 30 was tested twice for an exhaust leak, the first test indicating nothing was wrong with the vehicle and the second resulting in the minor detection of an exhaust leak, but "it wasn't high enough to be a health hazard."  (*Id.* ¶¶ 55-57.)

While Reynolds was a part-time employee with the Chittenango Police Department, he was not a member of the union; he did, however, become a member of the union when he became a full-time employee.  (*Id.* ¶¶ 110-11.)  In a letter dated December 21, 2017, Corey wrote to Reynolds that "[p]er our conversation of Monday, December 18, 2017, as a probationary officer, your last day of employment with the Chittenango Police Department will be February 1, 2018."  (*Id.* ¶ 114.)  Reynolds agrees that he received this letter, but he disputes that his last day was February

---

[2]  The disagreement regarding whether the test was for CO or CO2 does not impact the outcome of this decision, it is merely mentioned in the interest of maintaining a complete record of the facts.  And, regardless, defendants appear to agree with Reynolds' assertion that the references to "CO2" in Reynolds' deposition transcript should be to "CO."  (Dkt. No. 115, Attach. 5 at 26 n.6.)

1, 2018 and, instead, claims his last day and effective date of termination was February 9, 2018, and, accordingly, disputes Corey's characterization of him as a "probationary officer." (Pl.'s SMF ¶¶ 113-14.)

There are six incidents, the details of which the parties dispute, that occurred during Reynolds' employment that preceded his termination from the Chittenango Police Department.  First, beginning in August 2017, Corey, Capria, and Reynolds had a disagreement regarding Reynolds not being fully uniformed when his shift began at 3 P.M.  (Defs.' SMF ¶ 65.) Reynolds was warned on three separate occasions that he needed to be fully dressed in uniform and ready at 3 P.M.  (*Id.* ¶¶ 70-73.)[3]

Second, during Reynolds' full-time employment at Chittenango, he was called to investigate a larceny at a Tops Market.  (*Id.* ¶¶ 77-78.)  Cimpi gave Reynolds a folder of evidence from the larceny investigation, which contained a DVD disc.  (*Id.* ¶ 78.[4])  The DVD was not properly logged into

_____

[3]  Reynolds denies paragraphs 70, 71, and 73 of defendants' statement of material facts, however, his denials are without proper support in the record and, therefore, these paragraphs are deemed admitted.

[4]  Defendants refer to "Officer Dailey" in paragraph 78 of their statement of material facts, however, it is clear from the record that this is meant to be a reference to Cimpi, whose full name is "Cassandra Dailey-Cimpi."  (Defs.' SMF at 1.)

evidence.  (*Id.* ¶ 79.)  The parties disagree about who is to blame for the failure to log the DVD—defendants claim that Reynolds failed to do so and falsely blamed the events on Cimpi, while Reynolds maintains that Cimpi is at fault.  (*Compare id.* ¶¶ 79-82, *with* Pl.'s SMF ¶¶ 79-82.)

Third, Corey instructed Reynolds not to discuss the pending application of a recent hire, Officer Andrew Costello, with other members of the Chittenango Police Department.  (Defs.' SMF ¶ 87.)  Reynolds disobeyed Corey's order.  (*Id.* ¶ 88.)

Fourth, in November 2017, Reynolds appeared as the arraigning officer in a criminal case.  (*Id.* ¶ 93.)  Reynolds interrupted the defense counsel, in open court, during a discussion regarding setting bail for the aresttee, and the presiding judge instructed Reynolds not to interrupt the proceeding.  (*Id.* ¶¶ 94-95.)  In the days following, the same judge approached Reynolds to discuss the incident.  (*Id.* ¶ 97.)  The judge told Reynolds that his conduct "wasn't professional" to which Reynolds responded "something to the effect" of "if you have to hold me in contempt of court you have to do it."[5]  (*Id.* ¶¶ 96-97.)

_____

[5]  Reynolds, attempting to dispute this fact, mischaracterizes his deposition testimony.  (Pl.'s SMF ¶¶ 96-98.)  Reynolds testified that the judge told him, outside of court, that his interruption "wasn't professional"

Fifth, in December 2017, Reynolds was provided an arrest warrant issued by a different judge.  (*Id.* ¶¶ 102-05.)  Reynolds did not execute the arrest warrant and, instead, issued an appearance ticket, which he contends was at the direction of an assistant district attorney and not based upon his independent determination regarding the sufficiency of the warrant.  (*Id.* ¶ 108; Pl.'s SMF ¶ 108.)

Sixth, defendants claim that Reynolds was accused of making disparaging remarks about a fellow officer to a person in police custody.  (Defs.' SMF ¶ 167.)  Reynolds denies this.  (Pl.'s SMF ¶ 167.)

After Reynolds was terminated, he attended multiple meetings with Village employees, two of which he recorded, the first on February 20, 2018, and the second on February 28, 2018.  (Dkt. No. 118, Attach. 1 ¶ 19, Attachs. 9, 10.)  The first meeting was attended by Reynolds, his wife, Corey, Horning, and Kopp, and the second was attended by Reynolds, his wife, and Corey.  (*Id.*)  The conversations on these two recordings primarily consist of Corey explaining why, in his mind, Reynolds' employment had to

---

and he also conceded that his behavior in the courtroom was unprofessional—his testimony is that his interaction with the judge *outside of court*, during a conversation after the fact, was professional.  (*Id.*)  Reynolds' denials of these facts are disingenuous and without basis, and, therefore, paragraphs 96, 97, and 98 are deemed admitted.

be terminated and some negotiation about compensation to assist

Reynolds during his search for employment with other police departments.

(*Id*.)  The attendees of these meetings also discussed the supposed

potential for departmental and criminal charges against Reynolds for

alleged conduct during his employment, which Reynolds characterizes as

"threats."  (*Id.* ¶ 19).  Defendants deny that Corey threatened Reynolds,

asserting that Reynolds is inaccurately framing the tone and context of the

conversations and that Corey was consulting Reynolds and warning him of

the gravity of the potential consequences for his conduct, including, alleged

falsifying of business records.  (Dkt. No. 122, Attach. 4, Defs.' Response to

Pl.'s Additional SMF ¶ 255.)

**B.    Procedural History**

Reynolds filed his complaint in the New York State Supreme Court in

Madison County on February 7, 2019.  (Dkt. No. 2.)  The action was

removed to this court on April 5, 2019.  (Dkt. No. 3.)  On April 12, 2019,

defendants moved to dismiss.  (Dkt. No. 4.)  The motion to dismiss was

granted in part and denied in part by this court in March 2020.  (Dkt. No.

13.)  Specifically, the motion was granted as to Reynolds' (1) First

Amendment retaliation claim as against Baldwin, Bough-Martin, Keville,

11

Millet, and the Doe defendants; (2) Fourteenth Amendment procedural due process claim, to the extent it is based on Reynolds' interest in continued employment with the Village of Chittenango, as against the Village, Baldwin, Bough-Martin, Keville, Millet, and the Doe defendants; and (3) breach of contract claim as against Corey, and denied in all other respects. (*Id.*)  The defendants each answered the complaint on May 1, 2020.  (Dkt. Nos. 17-21.)  The court denied a motion by Reynolds to amend his complaint with respect to the proposed addition of a New York Labor Law § 201-d claim and subsequently granted a separate motion to amend his complaint with respect to his Fourteenth Amendment due process claim against the Village and his New York State law breach of contract claim against Corey.  (Dkt. Nos. 58, 66, 106.)  Reynolds then filed an amended complaint alleging four causes of action: (1) First Amendment retaliation pursuant to 42 U.S.C. § 1983 against the Village, Corey, Horning, Kopp, and Cimpi; (2) violation of Fourteenth Amendment due process pursuant to 42 U.S.C. § 1983 against the Village, Corey, Horning, Kopp, and Cimpi; (3) breach of contract against the Village; and (4) tortious interference against Horning and Kopp.  (Dkt. No. 68, Am. Compl.)  Now pending is defendants' motion for summary judgment.  (Dkt. No. 115.)

12

### III.  **Standard of Review**

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV.  **Discussion**

### A.  **Statements of Material Facts and Reynolds' Affidavit**

In their reply briefing, defendants urge the court to "strike and/or disregard the factual assertions and legal arguments that [Reynolds] has improperly included in his [response to defendants' statement of material facts]" and to disregard portions of Reynolds' affidavit, submitted in opposition to the motion for summary judgment, that defendants claim are improper.  (Dkt. No. 122 at 2-5.)  Defendants are correct that there are certain technical improprieties in Reynolds' Response to Defendants' Statement of Material Facts.  (Dkt. No. 118, Attach. 28.)  And Reynolds also complains of similar technical violations of the local rules by defendants.  (Dkt. No. 118 at 2.)  "However, a district court has 'broad discretion' to overlook such deficiencies in favor of a searching review of

the record." *Vormwald v. Liberty Mut. Life Assur. Co. of Bos.*, No.

5:05-CV-671, 2007 WL 2461781, at *2 (N.D.N.Y. Aug. 23, 2007) (quoting

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).

The court agrees with defendants that Reynolds' self-serving affidavit

contains information that is inconsistent with sworn testimony.  (Dkt. No.

122 at 3-5 (providing examples).)  Indeed, "a party may not create an issue

of fact by submitting an affidavit in opposition to a summary judgment

motion that, by omission or addition, contradicts the affiant's previous

deposition testimony."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619

(2d Cir. 1996).

With defendants' requests in mind, the court has carefully

circumscribed the facts relied upon in determining the instant motion to

include only material, relevant, and properly admitted facts.

## B.   Reynolds' Federal Constitutional Claims

Reynolds brings two federal claims under 42 U.S.C. § 1983: (1) a

Fourteenth Amendment due process claim; and (2) a First Amendment

retaliation claim.  (Dkt. No. 68)  The threshold issues, raised by

defendants, of whether the Village can be a party to this action pursuant to

*Monell* or if any of the individual defendants must be dismissed for lack of

14

personal involvement, (Dkt. No. 115, Attach. 5 at 22-23), are addressed first.

### 1.   Monell

Defendants argue that there is no basis to find that Reynolds' termination was based on municipal policy or customs, if the Constitutional claims are dismissed against all individual defendants they must also be dismissed as to an entity defendant because *Monell* claims against a municipal entity are derivative of claims against individual employees,[6] and the *Monell* claims are duplicative of Reynolds' official capacity claims against Corey, Horning, Kopp, and Cimpi.  (Dkt. No. 115, Attach. 5 at 28-30.)  Reynolds contends that the acts of Corey, as Chief of Police, an official with final policy making authority, is sufficient to create municipal liability under *Monell*.  (Dkt. No. 118 at 17-18.)

A municipality may be liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

_____

[6]  For the reasons discussed herein, the Section 1983 claims are not dismissed against all of the individual defendants and, therefore, this point is moot.

inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see Dixon v. City of Syracuse*, 493 F. Supp. 3d. 30, 36 (N.D.N.Y. 2020) ("[T]he constitutional violation underpinning a [Section] 1983 claim against a municipality must result from a governmental policy, custom or practice.")  To establish a municipal policy, practice, or custom, a plaintiff must provide evidence of (1) a formal policy endorsed by the municipality; (2) actions taken or decisions made by the municipality's policymakers, which caused the alleged civil rights violation; (3) a practice so widespread that it constitutes "a custom or usage"; or (4) a failure by the municipality's policymakers to properly train or supervise their subordinates.  *Green v. City of New York*, 465 F.3d 65, 80-82 (2d Cir. 2006) (citations omitted).  A chief of police has final discretionary authority over internal discipline and termination of officers in his or her police department, and, as such, can be treated as a final policymaker.  *See Brown v. City of Syracuse*, No. 5:01-CV-1523, 2008 WL 5451020, at *6 (N.D.N.Y. Dec. 31, 2008).  And, as the Second Circuit has held, a mayor can also be a final policy maker because "[w]here a city official has final authority over significant matters involving the exercise of discretion, his choices represent government policy."  *Gronowski v. Spencer*, 424 F.3d

16

285, 296-97 (2d Cir. 2005) (holding retaliatory termination by mayor established *Monell* liability because "he has final authority over hiring and firing decisions, which are discretionary matters") (internal quotation marks and citation omitted); *see Rookard v. Health & Hosp. Corp.*, 710 F.2d 41, 45 n.4 (2d Cir.1983) ("Mayors may be treated as policy makers without proof of their specific powers and responsibilities.")

Plaintiff has named Corey, the chief of police, and two individuals who acted as mayor during the relevant time-period, Horning and Kopp, as defendants.  (Am. Compl.)  The record before the court, particularly New York Village Law and Village of Chittenango Police Department General Orders, indicate that Corey, as well as Horning and Kopp, are the type of policy-making officials contemplated by *Monell* and that dismissal of the Village is improper.  Under New York Law, it is the responsibility of the mayor of a village "to exercise supervision over the conduct of the police," and the Board of Trustees, the meetings of which are overseen by the mayor, has the power to establish the village police department and appoint a chief of police.  (*See* N.Y. Village Law §§ 4-400, 8-800, Dkt. No. 115 Attachs. 34, 35.)  Additionally, the chief of police is the "chief administrator for the Chittenango Police Department" whose duties include,

17

among others, "supervis[ing] departmental personnel and evaluat[ing] job performance" and whose authority includes discretionary discipline of police officers, including termination if prior approval of the mayor is received.  (Village of Chittenango Police Department, General Orders No. 101, 103, Dkt. No. 115, Attachs. 46, 48.)  Therefore, the motion is denied with respect to defendants' argument that the Village must be dismissed for lack of *Monell* liability.

However, Reynolds fails to respond to defendants' argument that the *Monell* claims against the Village are duplicative of the official-capacity claims against the individual defendants.[7]  Reynolds has brought a First Amendment retaliation claim and a Fourteenth Amendment due process claim, both pursuant to Section 1983, against the Village as well as Corey, Horning, Kopp, and Cimpi, in their official and individual capacities.  The claims against Corey, Horning, Kopp, and Cimpi are effectively claims against the Village as "'[a]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.'"  *Sheriff's Silver Star Ass'n of Oswego Cty., Inc. v. County of Oswego*, 56 F. Supp. 2d 263, 265

---

[7]  As explained below, *see supra* Part IV.C.1, a defendant has only a modest burden of facial plausibility to prevail on unopposed summary judgment arguments.  Defendants meet this burden here.

18

n.3 (N.D.N.Y.1999) (citation omitted).  And, for this reason, courts routinely dismiss official capacity claims as redundant when the municipal entity is also a defendant to the same claims. *See id.* ("courts have dismissed official-capacity claims as unnecessary or redundant where similar claims are asserted against the entity") (citations omitted); *Cea v. Ulster County*, 309 F. Supp. 2d 321, 327 n.6 (N.D.N.Y. 2004).  Therefore, for this reason, the motion is granted with respect to the official capacity claims and both of the Section 1983 claims against Corey, Horning, Kopp, and Cimpi, in their official capacities, are dismissed.

   2.   *Personal Involvement*

   Reynolds' First Amendment retaliation claim is based upon allegations that defendants violated the rights guaranteed to him under the United States Constitution by retaliating against him for exercising his free speech rights to complain about defective equipment and exposure to noxious and toxic fumes in Vehicle 30.  (Am. Compl. ¶ 16.)  Defendants contend, among other arguments discussed in Part VI.B.4, that the First Amendment claim must be dismissed as against Corey, Horning, Kopp, and Cimpi because there is no basis to find that they had any personal involvement with any alleged First Amendment retaliation.  (Dkt. No. 115,

19

Attach. 5 at 22-23.)  Reynolds argues that individual defendant were personally involved, as set forth in more detail below.  (Dkt. No. 118 at 14.)

"It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983."  *Johnson v. Miller*, No. 9:20-CV-622, 2020 WL 4346896, at *9 (N.D.N.Y. Jul. 29, 2020) (internal quotation marks and citations omitted).  As to supervisory liability, there is no "special test," and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  "To establish a violation of [Section] 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights."  *Id.* at 618 (internal quotation marks and citation omitted).  It is not sufficient to plead that an official was "conceivably personally involved."  *Id.* at 615-16.

As for Corey, defendants argue that his recommendation that Reynolds be terminated was for good cause and that there is no basis to find that he acted with personal animus, but they do not argue that Corey

20

was not involved.  (Dkt. No. 115, Attach. 5 at 22.)  Reynolds contends that it is undisputed that Corey's recommendation that he be terminated set in motion the termination and that Corey had knowledge of Reynolds' protected activity because his complaints were either directly made to Corey or Corey acknowledged the complaints in some manner.  (Dkt. No. 118 at 14.)  The record here clearly indicates that Corey, as Reynolds' supervisor, was personally involved because, among other facts, Reynolds complained of the exhaust smell directly to him and Corey personally sent Reynolds the letter informing him of his termination.  (Defs.' SMF ¶¶ 47, 48, 53, 114.)

As for Kopp and Horning, defendants argue that Kopp was the interim mayor only during the month of January 2018 and that Horning was the interim mayor from February to March 2018.  (Dkt. No. 115, Attach. 5 at 22-23.)  This, defendants contend, means that Kopp and Horning could not have been personally involved because Reynolds was terminated on December 18, 2017; however, as discussed above, Reynolds claims he was not terminated until February 9, 2018, meaning both Kopp and Horning held the position of interim mayor during the time Reynolds claims he was employed.  (*Id.*)  Reynolds argues that both Kopp and Horning

were aware of his complaints and were present at the February 26 meeting where he was allegedly threatened with criminal and administrative charges.  (Dkt. No. 118 at 14.)  The interim mayor, a position both Kopp and Horning held during the relevant time period, has authority over the chief of police and, as Horning testified, he, Corey, and Kopp met to discuss Reynolds' "work performance, his probationary status as an employee, and his termination," during the time that Horning was the Police Commissioner and Kopp was the Co-Commissioner.  (Defs.' SMF ¶¶ 200-01.)  Thus, there are issues of fact with respect to the personal involvement of Kopp and Horning and, therefore, they are not entitled to summary judgment at this juncture.

Finally, as for Cimpi, defendants argue that she and Reynolds were of a "co-equal" rank, worked different patrol shifts, and had limited communication, and that, because of these facts, she could not have been personally involved in his termination.  (Dkt. No. 115, Attach. 5 at 23.)  Reynolds argues that "by virtue of her position of [Police Benevolent Association (PBA)] President" Cimpi was aware of Reynolds' protected activity, acted in concert with the other defendants, failed to intervene, ignored his concerns and "cut him out of [Collective Bargaining Agreement

22

(CBA)] discussions."[8]  (Dkt. No. 118 at 14.)

The court is not persuaded by Reynolds' attempt to create a dispute of material fact because the evidence relied upon by Reynolds does not indicate Cimpi's personal actions, but, rather, uses her position as PBA President to imply liability.  (*Id.*)  There is no evidence that demonstrates Cimpi, who did not have authority to hire or fire Reynolds, was personally involved in Reynolds' termination or the events that led to it.  Because defendants have established a lack of personal involvement and Reynolds has failed to demonstrate that a triable issue of fact exists regarding the

---

[8]  The court will not consider any supposed facts related to union activity.  As defendants point out, this court has already ruled on Reynolds' attempt to include union activity as a new basis for his First Amendment retaliation claim when it affirmed Magistrate Judge Miroslav Lovric's denial of Reynolds' motion to amend.  (Dkt. No. 122 at 9.)  The court granted Reynolds leave to amend only with respect to his *Monell* Fourteenth Amendment due process claim against the Village and his New York State law breach of contract claim against Corey, and denied his request to add a retaliation claim under New York Labor Law for union activity—Reynolds was not granted blanket authority to amend his pleading.  (Dkt. No. 106 at 4 n.2.)  Nor does Reynolds have blanket authority to change his theories at this stage of litigation.  As pleaded, Reynolds' First Amendment retaliation claim is solely based upon his speech related to the alleged exhaust leak in Vehicle 30.  (Dkt. No. 68 ¶¶ 15-18.)  Any attempt to re-litigate the scope of the speech that supports this claim, revive factual bases that the court has already ruled are not part of this case, or sneak improper facts into this case at this phase or any subsequent phase is improper and will not be tolerated.

same, the motion is granted in this respect and the Section 1983 claims

against Cimpi, the only claims against her, are dismissed and she is

dismissed from this case.[9]


### 3.     Fourteenth Amendment Due Process

Reynolds asserts a Fourteenth Amendment due process claim

pursuant to Section 1983, alleging that the Village, Corey, Horning, and

Kopp deprived him of "his property and liberty interests in continued

employment without due process of law in violation of the Fourteenth

Amendment of the United States Constitution."  (Am. Compl. ¶ 21.)

Defendants move for summary judgement on Reynolds' Section 1983

claims, primarily making the overarching argument that no material factual

dispute exists with regard to whether Reynolds was a probationary

---

[9]  The court notes that defendants only moved to dismiss the First
Amendment claim against Cimpi for lack of personal involvement,
however, the reasoning for the finding that she was not personally
involved necessarily applies to Reynolds' Fourteenth Amendment claim as
well.  Cimpi, who was Reynolds' "co-equal," was not in a position to hire or
fire Reynolds and, thus, could not deprive him of his employment nor any
process that may be due before such deprivation.  Therefore, Cimpi could
not have been personally involved in the alleged First Amendment
retaliation against Reynolds nor the alleged deprivation of his Fourteenth
Amendment due process, and both Section 1983 claims must be
dismissed against her.

employee with no property interest in his continued employment and no entitlement to a pre-termination hearing.  (Dkt. No. 115, Attach. 5 at 3-4.) Defendants make a number of specific arguments in favor of summary judgment, however, they must first meet their burden of demonstrating that there are no genuine issues of material fact, including with regard to their primary contention, that Reynolds was a probationary employee who was, therefore, not entitled to a hearing and had no property interest in continued employment.  *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists.") (citation omitted).

In other words, essential to the analysis of Reynolds' Fourteenth Amendment claim is a determination of whether he was a probationary employee at the time he was terminated.  The answer to this question—whether Reynolds was probationary—adjudges whether process was, in fact, due.  However, the parties dispute a multitude of material facts, leaving this determination unresolved—and, for summary judgment purposes, unresolvable.  *See id.* at 1224 ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to

25

discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.")

The parties agree that Reynolds was hired as a full-time officer for the Chittenango Police Department on July 24, 2017.  (Defs.' SMF ¶ 28; Pl.'s SMF ¶ 28.)  As for his termination date, though, defendants claim it was December 18, 2017, and Reynolds asserts he was not terminated until February 9, 2018.  (Defs.' SMF ¶ 113; Pl.'s SMF ¶ 113.)  Furthermore, the parties disagree as to whether Reynolds was hired as a lateral transfer or a resignation reinstatement, (Defs.' SMF ¶ 225; Pl.'s SMF ¶ 225), a crucial fact in ascertaining the length of Reynolds' probationary period, and, as such, essential to the determination of whether he was on probation on the date he was terminated.  (Defs.' SMF ¶¶ 142-43; Pl.'s SMF ¶¶ 142-43.)  If Reynolds' version of the facts is correct, and he was a lateral transfer subject to a maximum probation of six months, and his termination was on February 9, 2018, then his probation would have expired on or around January 24, 2018, meaning he was not an at-will employee on the date he was terminated.

A finder of fact must determine the date Reynolds was terminated

26

and whether he was a lateral transfer or a resignation reinstatement, and, only then, can the court determine whether Reynolds was a probationary employee at the time he was terminated and, thus, whether any process was due.  Therefore, due to the genuine issues of material fact that cannot be resolved at this phase of litigation, defendants' motion is denied with respect to Reynolds' Fourteenth Amendment due process claim.

### 4.    First Amendment Retaliation[10]

As discussed, Reynolds brings a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983 against all defendants based on allegations that the defendants retaliated against him for exercising his freedom of speech to oppose or complain about defective equipment and exposure to noxious and toxic fumes in Vehicle 30.  (Am. Compl. ¶ 16.)  Defendants argue that Reynolds' complaints about the smell of exhaust in Vehicle 30 was not a matter of public concern and was, instead, a personal grievance. (Dkt. No. 15, Attach. 5 at 20-22.)  Defendants also make a number of

---

[10]  The issue of defendants' personal involvement was resolved in Part IV.B.2, however, an analysis of the remaining arguments related to Reynolds' First Amendment retaliation claim is still necessary.

arguments as to why, in their view, summary judgment must be granted because there is no causal link between Reynolds' complaints about smelling exhaust in Vehicle 30 and his termination.  (Dkt. No. 115, Attach. 5 at 23-28.)  Defendants summarize their arguments in this regard as follows:

> The question presented for the [c]ourt is whether a genuine dispute exists that Plaintiff was terminated based on his complaints about the smell of exhaust in Vehicle 30.  In answering that question, the [c]ourt has to consider: (1) the fact that Plaintiff was a probationary employee and could be terminated "for almost any reason, or no reason at all"; (2) the six enumerated acts of subordination, deceit, and disrespect to the Court outlined above, as well as the fact that everyone had grievances with him; and (3) the fact that Plaintiff's complaints about the smell of exhaust were thoroughly investigated, tested a number of times, and resolved.  There is absolutely no genuine dispute of any material fact on this claim and there is no triable issue that Plaintiff was terminated for allegedly exercising his First Amendment right to complain about the smell of exhaust. Summary judgment is appropriate in [d]efendants' favor.

(*Id.* at 28.)  On the other hand, Reynolds contends that his protected speech occurred in close temporal proximity to the December 18, 2017 meeting, where he was either fired or informed by Corey that he would be fired, and that a pattern of antagonism exists, which constitutes a

retaliatory motive or animus.  (Dkt. No. 118 at 15-17.)

 To survive summary judgment on a First Amendment retaliation claim, a public employee must "bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action."  *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (citation omitted).  The standard for assessing whether a public employee's speech was protected speech under the First Amendment involves "two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, and it should consider the content, form, and context of the speech in light of the record as a whole.  *See Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999) (citing *Connick v. Myers*, 461 U.S. 138, 147-48, n.7 (1983)).  Central to this assessment is whether the

employee's speech was "calculated to redress personal grievances or whether it had a broader public purpose." *Lewis*, 165 F.3d at 163-64.

As this court previously ruled in its Memorandum-Decision and Order on defendants' motion to dismiss: "Reynolds' alleged speech involves complaints regarding hazardous workplace conditions, which have been considered by courts in this Circuit to be speech by a private citizen about a matter of public concern."  (Dkt. No. 13 at 8-9 (collecting cases).)  The court will not revisit this issue and, for the same reasons, finds Reynolds' speech addressed a matter of public concern and is protected.

The parties do not dispute that there was an adverse employment action, as they agree that Reynolds was terminated.  The only remaining element in need of analysis is causation.  As to this element, the court agrees with Reynolds that summary judgment is inappropriate for two reasons.  First, defendants' argument as to why there is no causal connection is predicated on an assumption that Reynolds was a probationary employee at the time he was terminated.  (Dkt. No. 115, Attach. 5 at 23-28.)  As discussed at length above, *see supra* Part IV.B.3, there are a number of disputed facts regarding whether Reynolds was on probation at the time he was terminated, and, therefore, summary

judgment is precluded where those facts are at issue.

Second, it is well established that when alleged protected speech occurs within weeks or months of an adverse employment action, such as here where Reynolds' complaints occurred, at most, within three months of his termination, that there is sufficient temporal proximity to support an inference of causation.  *See Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021) ("A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time . . . . [The Second Circuit has] previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation.") (citations omitted); *Raymond v. City of New York*, 317 F. Supp. 3d 746, 774 (S.D.N.Y. 2018) (discussing the consensus of courts in this Circuit that two or three months is adequate temporal proximity to establish a causal connection).  Thus, the time period between Reynolds' speech and his termination is sufficient to permit an inference of causation by the fact-finder.  For these reasons, the motion is denied as to Reynolds' First Amendment claim.

 5.   *Qualified Immunity*

Defendants assert that Corey, Horning, and Kopp are entitled to

qualified immunity because their actions were "clearly legitimate" and there were "ample non-retaliatory reasons for terminating [Reynolds'] employment." (Dkt. No. 115, Attach. 5 at 30-32.) For these reasons, defendants request summary judgment as to both the First and Fourteenth Amendment claims. (*Id.*) Reynolds counters that defendants are not entitled to qualified immunity because their conduct violated his clearly established constitutional rights and it was not objectively reasonable for defendants to believe their actions were lawful. (Dkt. No. 118 at 18-19.) Reynolds also argues that defendants acknowledge that the threshold inquiry for an analysis of this issue is "whether the plaintiff's version of facts shows the officers violated a constitutional right," but their arguments are based on a view of the facts in the light most favorable to themselves. (*Id.*)

Qualified immunity shields a government employee from liability in two circumstances: "(1) [when his] conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [his] acts did not violate these clearly established rights." *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010) (internal quotation marks, alteration, and citations omitted).

The court agrees with Reynolds. Defendants' arguments rely

entirely on the presumption that he was a probationary employee at the time he was terminated, which is a view of the facts from defendants' perspective—and a view that is in dispute.  As explained at length above, issues of material fact prohibit a finding, at this stage, that Reynolds was on probation when he was terminated.  Therefore, because defendants' argument that they are entitled to qualified immunity relies on material facts that are in dispute, summary judgment is precluded and the motion is denied in this respect.

## C.   <u>Breach of Contract</u>

As for breach of contract, defendants generally argue that the only contract that Reynolds could claim was breached would be the CBA between the Village and the PBA, but that the CBA has "no relevance or application" to the relationship between the Village and Reynolds and that, therefore, there is no basis for this claim.  (Dkt. No 115, Attach. 5 at 32-36.)  Defendants specifically assert that: (1) the CBA was expired and was no longer valid when Reynolds became a full-time employee; (2) Reynolds was not entitled to a pre-termination hearing because he was a probationary employee; and (3) Reynolds never sought to invoke the contract provisions and, therefore, cannot bring a claim for its breach.  (*Id.*)

33

Reynolds only responds to defendants' first sub-argument, that the CBA was expired, and then confusingly discusses a supposed oral promise made by Corey that Reynolds' probationary period would only be ninety days.  (Dkt. No. 118 at 19-20.)  Reynolds fails to respond to the other arguments made by defendants.

"A party's failure to oppose a portion of a motion requesting dismissal constitutes consent to the unopposed argument."  *Pierce v. New York State Police (Troop D Lowville)*, No. 7:05-CV-1477, 2011 WL 1315485, at *6 (N.D.N.Y. Apr. 4, 2011) (citing *Burns v. Trombly*, 624 F. Supp. 2d 185, 197 (N.D.N.Y.2008)).  Stated another way, "[i]n this District, when a non-movant willfully fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess[es] facial merit, which has appropriately been characterized as a 'modest' burden."  *Johnson v. Lew*, No. 1:13-CV-1072, 2015 WL 4496363, at *5 & n.6 (N.D.N.Y. July 23, 2015); *see Metro. Prop. & Cas. Ins. Co. v. Rodick*, No. 1:21-CV-1039, 2023 WL 6122849, at *5 & n.4 (N.D.N.Y. Sept. 19, 2023); N.D.N.Y. L.R. 7.1(a)(3).

Defendants have met their burden with regard to their argument that

Reynolds never sought to invoke the contract provisions.  Defendants assert that, as a matter of law, Reynolds cannot maintain a breach of contract provision against the Village because there is no claim or evidence that the union failed in its duty of fair representation under the CBA.  (Dkt. No. 115, Attach. 5 at 35-36.)  Defendants cite facially meritorious caselaw, which holds that breach of contract claims against a municipal employer should be dismissed where the plaintiff has not sued the union to contest fair representation.  (*Id.* (*citing Lore v. City of Syracuse*, 670 F.3d 127, 151 (2d Cir. 2012) and *Comerford v. Village of North Syracuse*, 2021 WL 950974, at *36 (N.D.N.Y. Mar. 12, 2021)).  Defendants proceed to argue that Reynolds knew he needed to seek representation from his union if he had a dispute with his employer because he had done so when he worked for the Manlius Police Department, and, despite this knowledge, Reynolds "never requested a hearing from either the union counsel or union president in relation to his termination from [the] Village." (*Id.* at 36.)  Because the Village's argument is facially meritorious and Reynolds fails to respond to this argument, the motion is granted as to the breach of contract claim.

**D.   Tortious Interference**

Reynolds has brought a claim against Horning and Kopp for tortious interference.  (Am. Compl. at 7.)  Defendants argue that this claim must be dismissed because Reynolds cannot establish the elements for tortious interference with contract, including, the existence of a valid contract, knowledge of said contract by Horning and Kopp, and intentional and improper procuring of a breach.  (Dkt. No. 115, Attach. 5 at 36-37.)  Reynolds contends that defendants "miss[] the mark" because his claim is for tortious interference with his prospective employment, not any contract with the Village, because Corey interfered with Reynolds' prospective employment with the Town of Geddes.[11]  (Dkt. No. 118 at 20-21.)

Tortious interference with contract and tortious interference with prospective economic advantage are, of course, distinct causes of action.

---

[11]  The distinction between the type of tortious interference brought in this case, made by Reynolds, follows this court's remark that tortious interference with a collective bargaining agreement, the only type of contract potentially at issue in this case, may be subject to dismissal. (Dkt. No. 13 at 28 n.9; *Spiegel v. Bekowies*, 669 F. App'x 38, 39 (2d Cir. 2016) ("[T]he [federal labor law] preempts a claim for tortious interference with a collective-bargaining agreement.") (citation omitted).)  Before the court pointed this out, Reynolds was purportedly pursuing a claim for tortious interference with his employment with the Village, not prospective employment with other police departments.  (Dkt. No. 10 at 19.)  Because of Reynolds' choice to tweak the direction of his tortious interference claim, Defendants' confusion in this regard is understandable.

However, this distinction does not save Reynolds' claim.  To prevail on a claim for tortious inference with prospective economic advantage under New York Law, a plaintiff must show "that '(1) [he] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir.2003)).

The court agrees with defendants' argument that Reynolds points to no facts to indicate Horning or Kopp, the only defendants to this cause of action, acted tortiously.  Nor has Reynolds offered proof that Horning and Kopp acted in any way that interfered with Reynolds' prospective employment with another police department, let alone any intentional interference done solely out of malice or by improper means.  Indeed, Reynolds points only to testimony regarding conversations Corey had with the Town of Geddes Police Department, but Corey is not a defendant to

this cause of action.[12]  Because Reynolds has offered no proof of tortious

actions by Horning and Kopp, especially not to the degree necessary to

satisfy the elements of this cause of action under New York Law, the

motion is granted as to the tortious interference claim.

## V. Conclusion

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' motion for summary judgment is

GRANTED IN PART and DENIED IN PART as follows:

GRANTED as to the first cause of action for First Amendment

retaliation, as against Cimpi in her individual and official

capacities and as to Corey, Horning, and Kopp in their official

capacities; the second cause of action for deprivation of due

process as guaranteed under the Fourteenth Amendment as

against Cimpi in her individual and official capacities and as to

---

[12]  Even if Reynolds had argued that Horning and Kopp aided and abetted Corey in a plot to tortiously interfere with his prospective employment, he has not brought forth sufficient proof because, to hold an individual liable for aiding in another's tortious interference, there must be a showing that the individuals to be held liable "took 'common action for common purpose by common agreement or understanding . . . from which common responsibility derives.'"  *IDX Capital, LLC v. Phoenix Partners Group*, 83 A.D.3d 569, 571 (1st Dep't 2011), *aff'd*, 19 N.Y.3d 850 (2012) (quoting *Goldstein v Siegel*, 19 A.D.2d 489, 493 (1st Dep't 1963)).

Corey, Horning, and Kopp in their official capacities; the third

cause of action for breach of contract; and the fourth cause of

action for tortious interference; and

**DENIED** in all other respects; and it is further

**ORDERED** that the following claims remain: (1) First Amendment

retaliation as against the Village and as against Corey, Horning, and Kopp

in their individual capacities; and (2) deprivation of due process as

guaranteed under the Fourteenth Amendment as against the Village and

as against Corey, Horning, and Kopp in their individual capacities; and it is

further

**ORDERED** that this case is deemed trial ready and a trial scheduling

order will be issued in due course; and it is further

**ORDERED** that the Clerk terminate Cimpi from this case; and it is

further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

October 4, 2023
Albany, New York

Gary L. Sharpe
U.S. District Judge